Filed 6/27/16  P. v. Crunk CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>KASEY ROBERT CRUNK,<br><br>        Defendant and Appellant. | A143097<br><br>(Sonoma County<br>Super. Ct. No. SCR647867) |

Kasey Robert Crunk challenges the trial court's imposition of consecutive sentences for two offenses arising out of Crunk's flight from a police officer.  Crunk contends the consecutive sentences violate Penal Code section 654 (section 654) because, he claims, the offenses were part of a single, indivisible course of conduct and were temporally proximate.  We have reviewed the record, and we conclude the trial court's finding that the offenses were separate is supported by substantial evidence.  Accordingly, we will affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

On March 27, 2014, at around 11:00 p.m., Santa Rosa Police Officer Patrick Gillette was on patrol in full police uniform and driving a marked police vehicle in the Codding Town area.  Officer Gillette saw a Honda sedan leaving the parking lot of the Motel 6 or Vagabond Inn, which the officer knew to be a high crime area.  The driver of the Honda was later identified as appellant Crunk.  The officer followed the Honda as it

1

pulled into a closed, darkened Chevron gas station. Officer Gillette parked nearby at a Bank of America and observed Crunk.

After approximately 30 seconds, Crunk drove away from the gas station. Officer Gillette performed a computer records search of the Honda's license plate and discovered its registration had expired, a Vehicle Code violation. Based on that violation, Officer Gillette decided to perform a traffic stop. He turned on his vehicle's forward facing red lights. Crunk did not pull over but instead accelerated to about 50 miles per hour in a 30 mile per hour zone and then turned right. Crunk had many opportunities to pull over but failed to do so.

Officer Gillette increased the number of lights displayed on his vehicle and activated the siren. The Honda still did not slow down or pull off to the side. Crunk pulled into an apartment complex, but the gate to the complex was closed. The reverse lights of the Honda illuminated and Officer Gillette slammed on his brakes. The Honda reversed and hit the front of the police vehicle causing damage to the front grille. It then turned left and headed west bound for a hundred yards. Crunk attempted to make a U-turn, but his car became inoperable. He got out of the car and ran back towards the apartment complex. He passed the officer, who was momentarily stuck in his seat belt, and climbed the fence to the complex. Crunk's sweatpants became entangled on top of the fence and he was stuck hanging from his clothing while suspended upside down.

Crunk struggled while suspended from the fence until his pants tore and he fell to the ground inside the apartment complex. Officer Gillette shouted at him to stop. Crunk's hands were concealed near his waistband. Officer Gillette told Crunk to show his hands. Concerned that Crunk had a weapon, the officer shot him with Taser darts, which incapacitated him for five seconds. After he recovered, Crunk got up and ran.

Rodney Gladney, a bystander, arrived on scene and jumped on Crunk. Gladney heard Officer Gillette yell "stop." Gladney then secured Crunk in an arm hold. After Gladney and Crunk struggled on the ground, Officer Gillette activated his Taser again. Crunk said "okay" and surrendered. The officer then handcuffed him to the fence. It had

been a minute from the time Crunk ran from his car to the time he was handcuffed to the fence. Additional officers arrived on the scene and Crunk was taken into custody.

Crunk was on parole. Officer Gillette found a hypodermic needle on the ground approximately 10 feet west of where Crunk had tried to jump the fence. He also found a bent spoon with a brown residue a few feet away from the needle.

On June 12, 2014, the Sonoma County District Attorney filed an information charging Crunk with a felony for operating a motor vehicle while willfully and unlawfully evading a pursing a peace officer with willful or wanton disregard for the safety of persons and property (Veh. Code, § 2800.2, subd. (a); Count I), a misdemeanor for leaving the scene of an accident (Veh. Code, § 20002, subd. (a); Count II), and a misdemeanor for willfully and unlawfully resisting a peace officer (Pen. Code, § 148; Count III). As to the first count, the information alleged four prior convictions within the meaning of Penal Code section 1203, subdivision (e)(4) which rendered Crunk ineligible for probation. The information also alleged Crunk had suffered three prison priors (Pen. Code, § 667.5, subd. (b)) and was ineligible for sentencing pursuant to Penal Code section 1170, subdivision (h) because he had a prior strike.

On September 15, 2014, a jury found Crunk not guilty of Count I, but guilty of the lesser included misdemeanor of evading an officer (Veh. Code, § 2800.1, subd. (a)). The jury also found him guilty of Counts II and III. The prison priors and other felony enhancement allegations were not proven as there were no felony convictions to which they could attach.

At a hearing on September 18, 2014, the trial court heard argument from counsel on whether sentencing Crunk on all offenses would violate section 654. The prosecutor argued all three offenses were separate for purposes of section 654 and thus could be sentenced separately. She contended there were three separate crimes, stating, "We have the [Vehicle Code section] 2800 alleged as the first act, then there's the vehicle accident, followed by Mr. Crunk's continued flight from Officer Gillette." The prosecutor acknowledged Crunk's crimes were of a similar nature, but contended Crunk "at every turn, literally every turn, was continuing criminal conduct, [and] never once acquiesced

3

to law enforcement until tased multiple times and subdued by a civilian witness." Defense counsel responded that section 654 applied because the offenses occurred within a short period of time and all of Crunk's conduct centered on one objective, namely, "to flee" from Officer Gillette.

The trial court sentenced Crunk to one year of county jail for evading a peace officer and to a consecutive 10-month term in county jail for resisting a peace officer, totaling 22 months. The court stayed the sentence on Count II, leaving the scene of an accident, pursuant to section 654, because it found the first two counts "factually merge as a continuous course of conduct." It explained its ruling as to Count III as follows: "Now, regarding the 148, I believe that's different. What was testified to, it is a separable charged incident. It is different manner of criminal objectives [*sic*] . . . . [¶] But, certainly, the testimony was that the collision occurred. There's a very short driving thereafter, until the car was disabled, completely. [¶] But then, there's a break. The officer sees the defendant['s] flight from his car, and then, the officer's trying to get out of his car, and the defendant at that time, there's a break in time, break in criminal objectives. He could have stopped and waited. [¶] And instead, he flees on foot, actually runs to the officer, and as the officer's hung up in his car, getting his seat belt off, the defendant proceeds past him. [¶] Then he gets hung up on the fence. So, there's another point in time he could have given up. Could have given up after the first tasing. Does not. [¶] In fact, civilian gets involved in trying to wrestle him down, hold him down. And the Court does find the significant break in time, break in activity and criminality involving now a civilian. It took a second tasing, once the civilian was clear from the defendant, before the defendant finally gave up on the 148. [¶] So, I do find that the 148 is not a continuous crime. It's different from being in a vehicle and not failing to yield to the officer's siren and lights. [¶] And there was a period of time in between where he could have made a different decision, but he decided instead to continue with a different crime, resisting, delaying, and getting involved in a [*sic*] civilian as well, whole different person, who [*sic*] could have been tried or charged as a separate crime, had the People

4

been clever enough in parsing through the facts of that arrest that was resisted not only by the deputy, but by the civilian."

On September 19, 2014, the trial court sentenced Crunk to one year of county jail on Count I and to a consecutive 10-month term for Count III, totaling 22 months. The court stayed the sentence on Count II pursuant to Penal Code section 654 (section 654). That same day, Crunk filed a notice of appeal.

DISCUSSION

Crunk raises a single claim of error on appeal. He contends the trial court erred in imposing a 10-month term in county jail for his misdemeanor conviction for resisting a peace officer (Count III), consecutively to his misdemeanor sentence for evading a peace officer (Count I). We will address his contention after setting out the governing law and our standard of review.

I.      *Governing Law and Standard of Review*

Section 654, subdivision (a), provides in relevant part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." This section "precludes multiple punishment for a single act or omission, or an indivisible course of conduct." (*People v. Deloza* (1998) 18 Cal.4th 585, 591.) "The purpose of the protection against multiple punishment is to insure that the defendant's punishment will be commensurate with his criminal liability." (*Neal v. State of California* (1960) 55 Cal.2d 11, 20 (*Neal*), disapproved on another point in *People v. Correa* (2012) 54 Cal.4th 331, 344.)

"It is defendant's intent and objective, not the temporal proximity of his offenses, which determine whether the transaction is indivisible. [Citations.] . . . [I]f all of the offenses were merely incidental to, or were the means of accomplishing or facilitating one objective, defendant may be found to have harbored a single intent and therefore may be punished only once." (*People v. Harrison* (1989) 48 Cal.3d 321, 335.) On the other hand, if the defendant "harbored 'multiple criminal objectives,' which were independent

5

of and not merely incidental to each other, he may be punished for each statutory violation committed in pursuit of each objective, 'even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.' [Citation.]" (*Ibid.*) In such a case, "the trial court may impose punishment for independent violations committed in pursuit of each objective even though the violations shared common acts or were parts of an otherwise indivisible course of conduct. [Citations.] The principal inquiry in each case is whether the defendant's criminal intent and objective were single or multiple." (*People v. Liu* (1996) 46 Cal.App.4th 1119, 1135.) Few crimes are the result of a single physical act. (*Neal, supra,* 55 Cal.2d at p. 19.)

While the temporal proximity of the crimes is not determinative, it is a relevant factor in our analysis. (See *People v. Martin* (2005) 133 Cal.App.4th 776, 781 [close temporal proximity of offenses was relevant consideration in determining whether defendant had single criminal objective]; *People v. Evers* (1992) 10 Cal.App.4th 588, 603, fn. 10 [same].) But even where multiple crimes occur very close in time, they will not be deemed to comprise a single act for purposes of section 654 if the defendant had a chance to reflect between offenses and each offense created a new risk of harm to the victim. (*People v. Felix* (2001) 92 Cal.App.4th 905, 916; *People v. Kwok* (1998) 63 Cal.App.4th 1236, 1255-1256.) Thus, even offenses separated by less than a minute may properly be viewed as separate acts, and punished separately, when each successive offense creates a new risk of harm. (*People v. Trotter* (1992) 7 Cal.App.4th 363, 366-368 (*Trotter*); see also *People v. Kwok, supra,* 63 Cal.App.4th at pp. 1255-1256.)

"Whether the defendant entertained multiple criminal objectives is a factual question for the trial court, and its findings on this question will be upheld on appeal if there is any substantial evidence to sustain them." (*People v. Nubla* (1999) 74 Cal.App.4th 719, 730.) We review the trial court's findings in the light most favorable to the People, and we presume in support of the sentencing order the existence of every fact the trial court could reasonably deduce from the evidence. (*People v. Atencio* (2012) 208 Cal.App.4th 1239, 1243.)

II.     *The Trial Court Did Not Err in Imposing a Consecutive Sentence for Count III.*

Crunk divides his argument into three parts.  We will discuss each in the order presented in his opening brief.

A.      *The Trial Court Did Not Sentence Crunk for an Uncharged Offense.*

Crunk first contends the trial court violated his right to due process and a fair trial by punishing him for the uncharged offense of resisting a civilian (Gladney), although the Penal Code contains no penalty for resisting a citizen's arrest.  Crunk acknowledges section 654 decisions ordinarily do not implicate the Sixth Amendment right to jury trial.  (See, e.g., *People v. Black* (2005) 35 Cal.4th 1238, 1264, vacated on other grounds in *Black v. California* (2007) 549 U.S. 1190.)  The difference here, he claims, is that the trial court considered "the 'criminality' of resisting a civilian, [and] impermissibly punished [him] for an uncharged, untried (and nonexistent) offense, which violated [his] right to a jury trial on all facts that increase his sentence."  We disagree, because we find Crunk's assertions are not borne out by the record.

In explaining its sentencing ruling, the trial court stated:  "And there was a period of time in between where he could have made a different decision, but he decided instead to continue with a different crime, resisting, delaying, and getting involved in a [*sic*] civilian as well, whole different person, *who [sic] could have been tried or charged as a separate crime,* had the People been clever enough in parsing through the facts of that arrest that was resisted not only by the deputy, but by the civilian."  (Italics added.)  As the italicized language makes clear, the court did not find Crunk guilty of a separate offense involving resisting a citizen's arrest.  The court was simply noting the People *could* have charged Crunk with a separate crime arising out of his altercation with Gladney, but the People did not "pars[e] through the facts of that arrest[.]"  Considered in context and in the light most favorable to the judgment, the court's statement can be viewed as nothing more than a passing comment on the additional danger Crunk created by running from his car and climbing into the apartment complex.  (See *People v. Foster* (1988) 201 Cal.App.3d 20, 27 [noting potential danger to robbery victims caused by defendant's imprisoning them in a store cooler].)  The court remarked only that the

7

People could have charged Crunk with some other offense of which Gladney was the victim, but it expressed no view about what that offense might be or whether Crunk was guilty of it.

> B.   *Substantial Evidence Supports the Trial Court's Finding that the Offenses Were Divisible.*

Crunk next argues that what he calls his nonviolent offenses stemmed from one indivisible course of conduct having the single objective of avoiding arrest by Officer Gillette. We reiterate that this is a question of fact which we review for substantial evidence, and we presume in support of the sentencing order the existence of every fact the trial court could reasonably deduce from the evidence. (*People v. Atencio, supra,* 208 Cal.App.4th at p. 1243.)

As our fact statement shows, Crunk first eluded Officer Gillette in his car, a course of conduct that endangered other motorists, as well as pedestrians and the police. Commission of his first offense, fleeing a pursuing peace officer while operating a motor vehicle, ended when Crunk got out of the Honda. As the trial court noted, there was "a break," and Crunk had an opportunity to reflect after his car was disabled. He did not surrender at that point, however. Instead, he went on to commit a new offense, resisting a peace officer, which introduced a new set of risks to the people in the surrounding neighborhood. Crunk then failed to surrender when he was caught on the fence, after he had fallen from the fence, and even after he was first tased.

Certainly, Crunk's two offenses had the same general objective of avoiding arrest, but the trial court could properly find they were nevertheless temporally separate and distinct crimes which enhanced the potential harm to public safety. (See *Trotter, supra,* 7 Cal.App.4th at pp. 367-368 [defendant who fired two gunshots at pursuing officer within the space of one minute could properly be punished for separate offenses].) Indeed, Gladney and the other residents of the apartment complex were drawn into the danger of the situation because of Crunk's run from his car. (See *id.* at p. 368 ["Defendant's conduct became more egregious with each successive shot. Each shot posed a separate and distinct risk to [the pursuing officer] and nearby freeway drivers."].) This evidence

supports the trial court's finding that the two offenses were separate.  The court therefore did not violate section 654 by imposing a sentence on Count III.

      C.      *The Offenses Need Not Be Separated by Any Minimum Period of Time.*

Crunk's claim that the offenses were not sufficiently temporally separate as to permit him time to reflect requires little further discussion.  As *Trotter* illustrates, a trial court may find offenses separate even when they are temporally proximate.  Indeed, in *Trotter,* the gunshots at issue were fired within one minute.  (*Trotter, supra,* 7 Cal.App.4th at p. 366.)  As our Supreme Court has explained in a case in which a series of sexual offenses were committed in rapid succession, "[c]ourts have long assumed that no minimum amount of time must separate such acts[.]"  (*People v. Harrison, supra,* 48 Cal.3d at p. 330.)  The same is true here.  Crunk has not persuaded us that the trial court's finding on this point is unsupported by substantial evidence.

DISPOSITION

The judgment is affirmed.

 

 

_____

Jones, P.J.

 

We concur:

 

_____

Needham, J.

 

_____

Bruiniers, J.